IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BETH A. WILLIAMS,

                Plaintiff,

         v.                            Civil Action No. 1:05-CV-113

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I. Introduction**

A.    <u>Background</u>

       Plaintiff, Beth A. Williams (Claimant), filed her Complaint on August 3, 2005, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner

of Social Security, (Commissioner).[1] Commissioner filed her Answer on December 20, 2005.[2]

Claimant filed her Motion for Summary Judgment on January 9, 2006.[3] Commissioner filed her

Motion for Summary Judgment and Brief in Support on February 22, 2006.[4]

B.    <u>The Pleadings</u>

           1.    <u>Claimant's Motion for Summary Judgment</u>.

           2.    <u>Commissioner's Motion for Summary Judgment and Brief in Support</u>.

---

[1] Docket No. 1.

[2] Docket No. 7.

[3] Docket No. 9.

[4] Docket No. 10.

C.    Recommendation

I recommend that:

    1.    Claimant's Motion for Summary Judgment be DENIED.

    2.    Commissioner's Motion for Summary Judgment be GRANTED because substantial evidence supports the ALJ's finding that Claimant's depression was not severe; the ALJ was not required to employ a psychologist or psychiatrist to conduct a psychiatric review technique; substantial evidence supports the ALJ's finding that Claimant's depression not be included in her residual functional capacity assessment; and the ALJ properly took into account Claimant's mild carpal tunnel syndrome when he limited her residual functional capacity assessment to light work.

## II. Facts

A.    Procedural History

On December 11, 2003, Claimant filed for Supplemental Security Income (SSI) payments, alleging disability since April 15, 2003.  The application was denied initially and on reconsideration. A hearing was held on January 28, 2005 before an ALJ.  The ALJ's decision, dated May 10, 2005, denied the claim finding Claimant not disabled within the meaning of the Act.  The Appeals Council denied Claimant's request for review of the ALJ's decision on June 27, 2005.  This action was filed and proceeded as set forth above.

B.    Personal History

Claimant was 41 years old on the date of the January 28, 2005 hearing before the ALJ. Claimant has a high school equivalent GED. Claimant has no relevant prior work experience.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: April 15, 2003–May 10, 2005.

**Kip Beard, M.D., 02/5/2004, Tr. 100**
Impression:    Williams suffers from chronic bronchitis/COPD, cervical and left shoulder strain with chronic musculoskeletal cervical spine and left shoulder pain, chronic musculoskeletal lower back pain, and chronic arthalgias.

**United Hospital Center, 2/20/2004, Tr. 111**
Diagnosis:    Carpal tunnel syndrome

**United Hospital Center, 11/25/03, Tr. 126**
Diagnosis:    Osteoporosis
Impression:    Williams has osteopenia in the femoral neck with normal bone density within the lumbar spine.

**United Hospital Center, 11/25/03, Tr. 130**
Impression:    Williams has right carpal tunnel syndrome.

**United Hospital Center, 11/25/03, Tr. 131**
Impresssion:    There are mild degenerative changes in the right knee, probably indicating early osteoarthritis.

**United Hospital Center, 4/12/04, Tr. 137**
Diagnosis:    Degenerative joint disease

**Psychiatric Review Technique, 1/7/04, Tr. 139**
Medical disposition:   No medically determinable impairment

**Physical Residual Functional Capacity Assessment, 4/14/04, Tr. 154**
EXERTIONAL LIMITATIONS:
    Occassionally lift and/or carry, 20 pounds;
    Frequently lift and/or carry, 10 pounds;
    Stand and/or walk for a total of, about 6 hours in an 8 hour workday;
    Sit for a total of, about 6 hours in an 8 hour workday;
    Push and/or pull, unlimited, other than as shown for lift and/or carry.

POSTURAL LIMITATIONS:
    Climbing ramps/stairs, balancing, stooping, kneeling, crouching, crawling: occassionally;
    Climbing ladders, ropes, scaffolds: never.

MANIPULATIVE LIMITATIONS:
    Reaching in all directions: limited;
    Handling, fingering, feeling: unlimited.

VISUAL LIMITATIONS:
    "None established" in all categories.

COMMUNICATIVE LIMITATIONS:
    "None established" in all categories.

ENVIRONMENTAL LIMITATIONS
    Extreme cold, extreme heat: avoid concentrated exposure;
    Wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation:
    unlimited;
    Hazards: avoid all exposure

**Family Practice Resident/Faculty, 5/28/04, Tr. 163**
Diagnosis:    Depression, cervical disc bulges, hepatitis C, carpal tunnel, osteoporosis

**Family Practice Resident/Faculty, 4/30/2004, Tr. 166**
Assessment:    Cervical strain, carpal tunnel, depression

**United Hospital Center, 4/16/04, Tr. 167**
Diagnosis:    Cervical radiculopathy
Impression:    Multi-level degenerative disc disease

**United Hospital Center, 4/16/04, Tr. 168**
Diagnosis:    Upper ext. parathesia and pain

**United Hospital Center, 4/16/04, Tr. 169**
Diagnosis:    Upper ext. parathesia and pain

**United Hospital Center, 4/16/04, Tr. 170**
Diagnosis:    Carpal tunnel

**United Hospital Center, 4/16/04, Tr. 172**
Impression:    Mild left carpal tunnel syndrome

**Family Practice Resident/Faculty, 4/2/2004, Tr. 174**
Assessment:    Carpal tunnel, cervical radiculopathy

**Family Practice Resident/Faculty, 3/26/04, Tr. 175**
The patients suffers from tingling and numbness in her neck and arms to her fingers. The patient has carpal tunnel syndrome and also suffers from depression.

**Family Practice Resident/Faculty, 3/26/04, Tr. 176**
Assessment:    Carpal tunnel syndrome

**Associated Specialists, Inc., 7/19/04, Tr. 180**
Assessment:    Hepatitis C

**United Hospital Center, 9/3/04, Tr. 194**
Diagnosis:      Hepatitis C

**Family Practice Resident/Faculty, 10/7/04, Tr. 198**
The patient suffers from chronic pain in her hip, back, neck, shoulder, and arms.  There is also carpal tunnel syndrome and bulging cervical discs.  The patient has hepatitis C.

**Family Practice Resident/Faculty, 9/1/04, Tr. 202**
Assessment:    COPD, depression, carpal tunnel, hepatitis C, osteoporosis, neck pain

**Family Practice Resident/Faculty, 7/7/04, Tr. 205**
Assessment:    Hepatitis C, carpal tunnel, COPD, restless legs, depression.

**James D. Weinstein, M.D., 11/2/04, Tr. 222**
Diagnosis:      Right carpal tunnel syndrome

**United Hospital Center, 11/1/04, Tr. 224**
Diagnosis:       Carpal tunnel syndrome

**Family Practice Resident/Faculty, 12/29/04, Tr. 234**
Assessment:    Back pain

**Family Practice Resident/Faculty, 12/8/04, Tr. 236**
Assessment:    Hepatitis C, depression

**United Hospital Center, 11/2/2004, Tr. 240**
Diagnosis:      Carpal tunnel syndrome on the right

**United Hospital Center, 3/10/05, Tr. 266**
Impression:    Mild left carpal tunnel syndrome

**United Hospital Center, 4/7/05, Tr. 275**
Diagnosis:       Dysfunctional uterine bleeding

**Family Practice Resident/Faculty, 2/2/05, Tr. 289**
Assessment:    Shoulder pain


D.      Testimonial Evidence
                                        1. Claimant

Testimony was taken from Claimant, who testified as follows:

[EXAMINATION OF CLAIMANT BY ALJ]

Q    Okay.  Now, you indicate you've been disabled since April of 2003.  What's the main reason that you haven't been able to work since then?

A    The carpal tunnel and my lower back pain, my cervical pain in my neck and shoulders because I get cortisone shots in my shoulder right now.  I'm still waiting to get the second surgery done on my left hand because it's got worse since I haven't been able to use my right.  And I can't - - I have trouble with sitting or standing for too long.  And I've kind of been in a pretty bad depression.  With the chronic pain, that makes me depressed, too.

Q    Now, what's - - you just recently had carpal tunnel surgery on - -

A    On my - -

Q    - - on of your hands?

A    - - right hand.  On the right hand.

Q    Did that make it better?

A    Not yet.  Dr. Weinstein said it might be up to six months before I could get full usage out of it.

Q    So what can you do with your hands?

A    I can't write.  I can't sit down and write a whole page yet and as far as dishes or anything like that that's - - I drop stuff.  I just have a hard time grasping anything.

Q    Can you hold a knife and fork?

A    For a short period - - yeah, for short periods of time.

Q    Can you hold a cup of coffee or glass of milk?

6

A       Sometimes I drop it.

Q       How often does that happen?

A       It just happened this morning.  Not all the time, but sometimes I'll still get numbness in my hand and I can't feel it and that's whenever it happens.  Just depends on how long I use my arm.  And also, I get the cortisone shots in the right shoulder.

*          *          *

Q       How far can you walk?

A       Uphill?

Q       No, on a level - -

A       Not far.  I could probably walk maybe a little bit less than a quarter mile and then I get muscle spasms in my calves.

Q       How about just standing, like if you're standing - -

A       Standing?

Q       - - around a sink or stove?

A       Maybe five minutes and then I have to move or sit down.

Q       Any problems with sitting?

A       Yeah.

Q       What?

A       My back.

Q       How long can you sit at a stretch?

A       About 15 minutes or so.  And sleeping - - I don't get - - I don't remember the last time I've had a good quality night's sleep.

7

Q        What's the most you can lift?

A        Well, I have trouble with a gallon of milk.  I have to take two hands to pour a cup of milk.  And also, my medicine makes me shake.  I'm on a lot of medications.

Q        What's the problem with your right shoulder, osteoarthritis?

A        Yeah.

                                    *                    *                    *

Q        Does the hepatitis C cause you anything - - any problems other than not having any surgeries?

A        Oh, all kinds of them.  The treatment that I have to take for it - - the - - I have to take a shot a week - - one shot a week and - -

Q        Of Interferon?

A        Yeah, and then three pills in the morning and three pills at night for the Co-Pegasus.  And that makes - - that worsens my depression and it makes me sick.  My hair's thinning.  And as far as sleeping, I'm fatigued all the time.  Just - - and yeah, I get real irritable when - - I'm not a very fun person to be around.

Q        Does anything make your fatigue worse?

A        Getting up in the morning.  And I hate to - - I just - - I don't have a life anymore.  It just all centers around doctors and medications.  I can't have a relationship, you know, a normal relationship because of this.

Q        Are you getting treated for depression?

A        Yes, sir.  They just upped my dosage.  I'm taking Paxil CR, 50 milligrams a day.

Q        Does that help?

A        Sometimes it seems to, but not very good.

Q        What doctors are you seeing for this?

A        Well, I'm seeing Dr. Gabriel [phonetic] at Family Medicine, Dr. Casbay for the hepatitis and I have Weinstein for a surgeon and I did have Ruhemian [phonetic] for a gynecologist, so I'm seeing a bunch of them.  But Dr. Gabriel's my primary doctor.

Q        And he's the one that's - -

A        She's - -

Q        - - treating you - -

A        Yeah, she's the one that's treating the - -

Q        - - for depression?  So you're not seeing a psychologist or psychiatrist?

A        I think I will be.  I think I'm going to have to.

Q        How does the depression affect you?

A        My house is a mess because I just - - sometimes it seems to me just too much.  It's just too much work.

Q        Um-hum.

A        And I get a little bit of help from my kids, but they're not - - you know, they're older and they've got their own lives, too.  I don't get out, except for to see doctors.  I live out in the country a good bit.  I just recently lost my grandmother, who lived next door to me.  I just can't function normally anymore.

Q        Um-hum.

A        Interact with people or anything.

Q        How do you spend your time most days?

A       Well, walk around my house.  I'll pick up a book.  I might be able to read a chapter or so before I just lose interest.  And like I said, my kids come over and they always try to cheer me up because they're right there on the block with me.  My youngest son lives across the street from me and my oldest boy, he's moving in there, too.  So I do have my children close to me.

Q       Do you do the cooking and cleaning and dishes for your house?

A       It takes me - - I get help with that mostly.  And my kids have been taking my clothes along with them to the laundromat and things.  And my youngest boy's girlfriend, she'll come down and do dishes for me and run the sweeper, dust.

Q       Do you do anything?

A       There really is not a whole lot I can do.  Sometimes I'll do the dishes, but one sink-load of dishes, I have to - - it'll take me three breaks to get through it - -

Q       Um-hum.

A       - - because of the standing and it hurts my neck and my hands and my lower back.

Q       Do you ever get out and go to a restaurant or movie or church or anything like that?

A       Sir, the only think I get to do is go to the doctors.  That's the only time I get out.  I don't have a vehicle.   I don't have transportation and the medication - - the Interferon and - - there's a couple other medications, too, that - - I get problems with my vision, like I have halos. And I let my driver's license expire because I can't drive.  I can't sit long enough.

Q       Do you have any hobbies or anything you enjoy doing?

A       I used to love to ride motorcycles and things like that, but I can't do it anymore. And I used to love to read, but it just seems like too much work.  I've just lost interest.

Q        Do you ever get out to visit friends or relatives?

A        Like I said, my kids come over all the time.  but no, I don't have any close relatives, except for my two children and my mom.  And she just lost my step-dad and he died of hepatitis C.  Twila knows him.  Goes to church - - she used to go to church with him.  And I didn't catch hepatitis C from him.  It's probably from - - the way we figured it, tattoos.

Q        Now, you said you have a problem with your neck and low- back?

A        Yeah.

Q        What kind of problem do you have there?

A        With my neck I've got degenerative disk disease and the osteoarthritis and I'd had a - - it wasn't an accident, but the company I used to work for in North Carolina had a 13-foot flatbed truck and the tires weren't very good on it, so you'd have to hit the ditch hard.  And I went up, hit the cab - - top of the cab, put my neck in one spot for about three weeks.  But I couldn't afford not to work, so I didn't draw any Workman's Comp or anything.  Besides that, the company was going bankrupt, anyhow.  And I've had trouble with it ever since then, but it's really gotten worse.

                    *            *            *

Q        Do you have any other conditions that we haven't talked about?

A        My knees.

Q        What's the problem with your knees?

A        My left one's starting to go out on me.  It'll drop me.

Q        Have you told the doctors about that?

A        Yes, due to osteoarthritis, but I've got enough to deal with right now without even

thinking about putting something else on there, yet.  These treatments that I take for the hepatitis

is what really - - it really gets me down.

Q       How does that - - how so?  What - -

A       The - - just the tiredness all the time.  And when I first take the shot, it'll make me

sick and I get headaches.  And like I said, my vision - - it gets blurred, so I can't drive.  And I lose

- - yeah, I lose track of myself, too.  I'll just be glad when it's over with, one way or the other.

Q       When what's over with?

A       The treatments for the hepatitis.

*            *            *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q       Ms. Williams, what's your current weight?

A       186, I think.

Q       Okay.  Now, is this unusual for you?

A       Yes, I've gained a lot of weight in the past two years.

Q       Okay.  And what would you contribute  the weight gain to?

A       I can't do as much as I used to.  I eat - - like I said, I was always used to an active

lifestyle and the medications that I'm on also helped me gain weight.  Like I need any help with

that.

Q       Okay.  Does - - is this weight gain affecting you mentally?

A       Yeah, as well as physically.

Q       Okay.  How does it affect you mentally?

A       Look at me.  As far as, you know, being seen out in a bathing suit or anything like

that, you'll see a big t-shirt overtop and just - - it gets me down in my back.

*        *        *

A      I couldn't tell you what it would weigh.  I used to be able to carry a 50-pound bag of concrete mix, Quickcrete [phonetic], and I used to be able to lift it.  I used to be able to go up a ladder with a bundle of shingles.

Q      Okay.  And was this an everyday task?

A      Yeah.

*        *        *

Q      Okay.  Let's talk about a day that you might get up early in the morning and have just minimal pain.  Okay?  Kind of tell us what happens on those days that you might wake up with minimal pain.

A      Well, I usually go and get me a glass of tea and it takes me a long time to wake up because - - well, I go to the bathroom and - - let's see.  Sometimes - - I'll feed my cat.  And usually Alan [phonetic] comes over about that time and - - that's my oldest son.  And he'll flip through the channels and stuff and make sure my wood burner's going good.  And so I'll sit down with Alan for, you know, a few minutes here and there.  And mostly I'll stretch out and lay on the heating pad because that does help reduce the pain, too.  And that makes - - I sound lazy, but I just - - there's just not much I can do.  The boys, they always want me to come out and help them with the snow fort and things like that, but I - - the cold just - - it causes the pain to get worse.  And just generally, my world revolves around it.

*        *        *

Q      What kind of things makes your pain become really severe?

13

A        If I sit or stand too much.  Like right now, my back's - - my lower back is killing me.

*            *            *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

ALJ        Oh, okay.  Well, Dr. Ostrowski, let me give you a hypothetical question.  If we assume a hypothetical individual of the same age, education and work experience as the claimant, assume an ability to do light work as that's defined in the Commissioner's regulations, but there'd  be no climbing ladders, ropes or scaffolds.

CLMT        I have a big fear of heights.

ALJ        Yeah.  And no - -

CLMT        My brother was killed that way.  I'm sorry.

ALJ        No more than occasional work on stairs or ramps.  And no more than occasional balancing, stooping, kneeling, crouching or crawling.

CLMT        I can't do that.

ALJ        And assume the job should have no exposure to workplace hazards, like heights or dangerous, moving machinery.  And no exposure to significant hot or cold temperature. Would there be any jobs such a person could do at the - - well, actually it'd be no reaching or overhead work with the right shoulder.  So no reaching overhead or no overhead work with the right arm or shoulder.  Would there be any jobs such a person could do at the light or sedentary levels?

A        Yes, Your Honor, there would be work of a mail clerk.  That would be working in the private industry, as opposed for working for the Postal Service.  There would be

14

85 jobs in the local economy, 79,215 in the national economy. that is a light job. There would be work of a general office clerk. In the local economy there are - - it's a light job. There are 181 jobs in the local economy, 165,819 in the national economy. There would be the work of a packer. It's a light job. In the local economy there are 56 jobs. In the national economy, 28,644 jobs. As far as a sedentary job, there would be the work of an interviewer. In the local economy there are 78 jobs. In the national economy, 38,481 jobs.

Q          38,000 how many?

A          481 jobs.

Q          481. Okay.

A          There would be the work of an order clerk. In the local economy there are 15 jobs, in the national economy, 17,225 jobs.

\*          \*          \*

E.     Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

•     Bathes and dresses herself (Tr. 97)

•     Speaks understandably and follows instructions without difficulty (Tr. 99)

•     Is able to care for herself and prepare meals (Tr. 121)

•     Has no difficulty in walking (Tr. 232)

•     Can hold a knife and a fork for short periods of time (Tr. 297)

•     Can holds a cup of coffee and a glass of milk (Tr. 297)

- Can walk a quarter mile on level ground (Tr. 297)

- Can stand for five minutes (Tr. 298)

- Can sit for fifteen minutes (Tr. 298)

- Is able to read a chapter in a book (Tr. 301)

- Washes dishes (Tr. 301)

- Obesity (186 pounds) (Tr. 306A)

- Feeds her cat (Tr. 310)

- Naps for at least two hours per day (Tr. 311)

- Smokes one pack of cigarettes per day (Tr. 312)

### III.  The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred: (1) in determining that Williams' depression did not constitute a severe impairment; (2); in failing to obtain the opinion of a mental health professional to evaluate Williams' claimed depression; and (3) in failing to include Claimant's depression and limitations from carpal tunnel syndrome in his residual functional capacity assessment.

Commissioner maintains that the ALJ's decision was supported by substantial evidence. Specifically, Commissioner contends that the ALJ properly considered Claimant's depression to not constitute a severe impairment and properly employed a Vocational Expert to determine that Claimant's carpal tunnel syndrome did not disable her under the Social Security Act.

B.    <u>The Standards</u>.

    1.    <u>Summary Judgment</u>. Summary judgment is appropriate if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review. Only a final determination of the Commissioner may receive judicial review. See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i),

423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.      <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from

a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.      Discussion

I.

The ALJ's Evaluation of Plaintiff's Depression

Claimant contends that the ALJ failed to properly consider her depression. She argues that the ALJ misinterpreted the evidence, which in fact showed her depression to be severe. In the alternative, Claimant contends that the ALJ should have obtained the services of a medical expert to evaluate her before he decided her depression was not severe. The Commissioner asserts that the ALJ correctly considered Claimant's depression. Commissioner also argues the ALJ was not required to obtain the services of a medical expert to evaluate Claimant after her diagnosis of depression.

Obviously, the first question must be whether the record in fact demonstrates Claimant's depression to be severe. If it does, the question of whether the ALJ should have obtained the services of a medical expert to evaluate Claimant before making his decision is irrelevant. The question of whether the Claimant's depression is severe according to the record is a question of fact. Claimant bears a high burden here. As mentioned above, the Court will not reverse the ALJ's decision as long as it was supported by "substantial evidence." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). It is the duty of the ALJ, not the courts, to make findings of fact, and the court will not substitute its judgment for that of the ALJ as long as substantial evidence exists. Id.

An impairment is severe when, whether by itself or in combination with other impairments,

it significantly limits a claimant's physical or mental abilities to perform basic work activities.  20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).  See also Byrd v. Apfel, No. 98-1781, slip op. at 2 (4th Cir. Dec. 31, 1998);[5] Social Security Ruling 85-28.  "Congress explicitly requires that 'the combined effect of all the individual's impairments' be considered 'without regard to whether any such impairment if considered separately' would be sufficiently severe."  Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989) (citations omitted).  "[T]he Secretary must consider the combined effect of a claimant's impairments and not fragmentize them."  Id.  "[T]he ALJ must adequately explain his or her evaluation of the combined effects of the impairments."  Id.

The record in this case contains substantial evidence to support the ALJ's decision that Claimant's depression was not severe.  The Psychiatric Review Technique, conducted in January 2004, found no evidence of any mental impairment. (Tr. 139).  When doctors diagnosed Claimant with depression, they treated her symptoms with medication, first prescribing Wellbutrin, and then Paxil.  (Tr. 166, 179, 202, 205, 236).  Although Claimant notes that doctors increased her Paxil gradually increased her Paxil dosage from 10mg, to 25mg, to 37.5mg, and finally to 50mg, there was evidence that the treatment had beneficial effects.  (Tr. 202, 205, 236, 288).  On February 2, 2005, Claimant was noted to be "less depressed." (Tr. 288).  Furthermore, at the time of the hearing before the ALJ, Claimant had not sought any treatment from a psychologist or psychiatrist.  (Tr. 300).  She simply relied on her family physician to prescribe medication to treat her depression.  (Tr. 300).  All of this evidence provides substantial support for the ALJ's conclusion that Claimant's depression did not constitute a severe impairment.

---

[5] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

The next question is whether the ALJ should have employed a psychologist or psychiatrist to aid in his evaluation of Claimant's alleged depression. Statute requires that a determination that

> an individual is not under a disability, in any case where there is evidence which indicates the existence of a mental impairment, shall be made only if the Commissioner of Social Security has made every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment.

42 U.S.C. § 421(h). Hence, whenever there is evidence of a mental disability, the ALJ must use every reasonable effort to ensure a medical professional examines the claimant. Although Claimant argues this imposes an absolute duty, this is not the case. Andrade v. Sec'y of Health & Human Servs., 985 F.2d 1045, 1050 (10th Cir. 1993). A court should affirm the decision of an ALJ regarding the extent of a claimant's mental disability where the ALJ did not consult a medical professional so long as substantial evidence exists. Id.

In this case, medical professionals did evaluate the Claimant in the Psychiatric Review Technique, dated January 7, 2004. Tr. 139. That report was affirmed in April 2004. Id. At the time the examination was conducted in January, however, the Claimant did not have a documented history of depression. The record does not indicate a diagnosis of depression until at least March 26, 2004. (Tr. 175). Claimant did not receive any additional examination by medical professionals working on behalf of the Commissioner before the ALJ denied benefits. (Tr. 15). Thus, Claimant did not receive an examination by a psychologist or psychiatrist "where there is evidence which indicates the existence of a mental impairment." 42 U.S.C. § 421(h). While the Commissioner had an obligation to make "every reasonable effort" to do this, it is not an absolute obligation and the ALJ's decision will nevertheless be

affirmed as long as substantial evidence exists to support his decision.  <u>Andrade</u>, 985 F.2d at 1050.

As mentioned above, substantial evidence does exist to support the ALJ's decision that Claimant does not suffer from severe depression.  The ALJ correctly noted that the medical records contain only occasional reports of depression.  To treat the depression sometimes mentioned, Claimant received the anti-depressant medication Paxil, in gradually increasing doses throughout 2004.  (Tr. 202, 205, 236).  The treatment had positive effects.  Shortly before Claimant's hearing before the ALJ, in February 2005, Claimant's doctor noted her to be "less depressed."  (Tr. 288).  All of this evidence combines to represent substantial evidence in support of the ALJ's position.

## II.

### The ALJ's Failure to Include Depression and Limitations from Carpal Tunnel Syndrome in His Residual Functional Capacity Assessment

Claimant next argues that the ALJ erred in failing to include in his residual functional capacity assessment (RFC) any limitations caused by her depression or carpal tunnel syndrome.  The Commissioner responds that Claimant's depression did not cause her any functional limitations and so did not need inclusion in her RFC.  Commissioner also contends the ALJ took account of Claimant's limitations caused by her carpal tunnel by his questions to the Vocational Expert.

The RFC is what Claimant can still do despite her limitations.  20 C.F.R. § 404.1545.  It is an assessment based upon all of the relevant evidence.  <u>Id.</u>  It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition.  <u>Id.</u>  Observations by treating physicians,

psychologists, family, neighbors, friends, or other persons, of Claimant's limitations may be used.  Id.  These descriptions and observations must be considered along with medical records to assist the Social Security Administration to decide to what extent an impairment keeps a claimant from performing particular work activities.  Id.  This assessment is not a decision on whether a Claimant is disabled, but is used as a basis for determining the particular types of work a claimant may be able to do despite his impairments.  Id.

In this case, the RCF for Claimant did not include any limitations based on depression. The ALJ's findings regarding Claimant's RFC do not include any limitations from depression.  (Tr. 20).  They also do not include any explicit limitations from carpal tunnel syndrome, although the findings do note Claimant's carpal tunnel represents a severe limitation.  (Tr. 20).  The ALJ's findings will be upheld as long as substantial evidence supports them.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Analysis reveals that the ALJ did not list any functional limitations from Claimant's depression because he believed she had few to none such limitations.  The ALJ found that "claimant has no mental impairment that would significantly limit her mental ability to do basic work activities."  (Tr. 14).  He also noted that Claimant's physician only seldom noted depression as an ailment and treated it effectively with Paxil.  (Tr. 14-15).  While the ALJ admitted that since the depression was a diagnosed illness it represented a valid medical impairment, he also found that "it would impose no more than mild functional limitations with no episodes of decompensation."  (Tr. 15).

Substantial evidence supports the ALJ's determination.  The ALJ correctly notes that many evaluations of Claimant by physicians do not mention depression.  (Tr. 14).

Furthermore, Claimant's physicians gradually increased her dosage of Paxil to combat her symptoms of depression. (Tr. 202, 205, 236). The treatment appeared to have effect, for as the ALJ correctly noted, in February 2005 Claimant's doctor noted her less depressed. (Tr. 15, 288). All of this supports the ALJ's judgment that Claimant's depression would impose no functional limitations. Whether this Court agrees with the ALJ is irrelevant as long as substantial evidence supports his finding, which it does.

Analysis also reveals that although the ALJ did not include any functional limitations directly and only traceable to Claimant's carpal tunnel, limitations from carpal tunnel partly accounted for the RFC the ALJ determined for Claimant. After reviewing the Claimant's depression in his opinion, the ALJ examined the Claimant's history of hepatitis C, carpal tunnel, COPD, and osteoarthritis. (Tr. 15). The ALJ specifically found that "objective medical evidence of record failed to show sufficient persistent disorganization of motor functions from her bilateral carpal tunnel syndrome." (Tr. 15). He later examined Claimant's carpal tunnel history in more detail, noting a surgery Claimant had in 2004 and a medical report that the surgery aided Claimant. The ALJ also mentioned a March 2005 medical report that Claimant suffered from only mild carpal tunnel syndrome. (Tr. 17). After examining this medical history, along with the Claimant's testimony, the ALJ determined Claimant had the RFC for light work. This included limitations such as only "occasional work on stairs or ramps," only occasional "stooping, kneeling, crouching, or crawling," and no work around dangerous machinery, among others. (Tr. 18). These limitations came at least in part from Claimant's carpal tunnel syndrome. Like the ALJ's findings regarding Claimant's depression, this Court will interfere only if substantial evidence does not support the ALJ.

Hays, 907 F.2d at 1456.

The record here provides substantial evidence in support of the ALJ's conclusions. The medical doctor who conducted Claimant's physical residual functional capacity assessment in February 2004 found no manipulative limitations. (Tr. 117). This represents an express finding by a qualified physician that Claimant's carpal tunnel syndrome did not limit her residual functional capacity. Additionally, Dr. James Weinstein reported in November 2005 that surgery to relieve Claimant's carpal tunnel aided her. (Tr. 239). A study in March 2005 also concluded Claimant had only mild left carpal tunnel. (Tr. 266). When these findings were combined with the ALJ's assessment of Claimant's other ailments, the RFC for light work resulted. The ALJ had substantial evidence to support his conclusions.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be DENIED.

2. Commissioner's Motion for Summary Judgment be GRANTED because substantial evidence supports the ALJ's finding that Claimant's depression was not severe; the ALJ was not required to employ a psychologist or psychiatrist to conduct a psychiatric review technique; substantial evidence supports the ALJ's finding that Claimant's depression not be included in her residual functional capacity assessment; and the ALJ properly took into account Claimant's mild carpal tunnel syndrome when he limited her residual functional capacity assessment to light work..

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with

the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

DATED: 8/21/06

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE